*EXHIBIT C*

Before the
Federal Communications Commission
Washington, D.C. 20554

In re Application of

ROBERT L. KILE      File No. 00376-CL-AL-87

For consent to the assignment of
the license for Station KNKA598
operating in Domestic Public
Cellular Radio Telecommunications
Service in the Fort Myers,
Florida Metropolitan Service
Area (MSA)

## MEMORANDUM OPINION AND ORDER

Adopted: January 18, 1990;      Released: January 25, 1990

By the Commission:

### I. BACKGROUND

1. In August 1987, Robert J. Kile (Kile) filed an application to assign its cellular radio license for Domestic Public Cellular Radio Telecommunications Service (DPCRTS) Station KNKA598 to Palmer Communication, Inc. (Palmer).[1] P&T Communications (P&T), an entity holding a minority interest in that station license, filed a petition to dismiss or deny the assignment application. In its Petition to Deny, P&T argued that (1) Palmer's assignment application failed to present the financial showings required by Section 22.917(d) of the Rules; (2) Kile's June 1986 amendment to its application, and its August 1987 assignment application contained inconsistent statements; and (3) the Commission should void as against public policy a settlement agreement provision prohibiting petitions to deny by its signatories. On March 8, 1988, the Mobile Services Division (MSD) denied P&T's Petition to Deny and granted the application for assignment. *Robert J. Kile*, 3 FCC Rcd 1087 (Mob. Serv. Div. 1988) (*Kile*). In *Kile*, the MSD held that Palmer had demonstrated that it had the funds available to acquire the Fort Myers facility. The MSD stated that Palmer had submitted a financial commitment letter indicating that the Bank of New York would lend Palmer a total amount substantially in excess of the purchase price of the facility. Thus, the MSD found that Palmer complied with the financial qualification requirements of Section 22.917(d) of the Rules. In addition, the MSD held that it would not void a provision of the Fort Myers' settlement agreement which prohibits its signatories from filing petitions to deny. The MSD found that the issue raised by P&T is a private contractual matter best resolved by negotiation or by the courts. On April 11, 1988, P&T filed an application for review of the MSD's decision in *Kile*. Responsive pleadings were filed.

2. In its Application for Review, P&T argues that the MSD erred in finding Palmer financially qualified and that the MSD should have declared the provision of the Ft. Myers settlement agreement prohibiting petitions to deny void as against public policy. Kile and Palmer have filed oppositions. P&T has filed a reply.[2]

### II. FINANCIAL QUALIFICATION

#### A. *Contentions of the Parties*

3. P&T argues that the MSD misconstrued the financial requirements of Section 22.917 of the Rules. Section 22.917(d) requires, P&T argues, the proposed assignee also to submit information required under the guidelines of Section 22.917(a) of the Rules, i.e., the estimated costs of construction or operation, balance sheet, income statement, statement of projected revenues and expenses, and a statement of projected sources and application of funds. P&T further argues that because Palmer's bank letter does not specify an interest rate, it does not contain a sufficient description of the terms of the loan as required by Section 22.917(d) of the Rules.

4. Moreover, P&T argues, the MSD lacked a rational basis upon which to find Palmer financially qualified. Financial qualification must be demonstrated, P&T argues, by a showing of sufficient net liquid assets or total assets [3]--not by a showing that the applicant has a substantial financial cushion over the acquisition cost. P&T asserts that " *any* finding of financial qualifications *must* compare an applicant's financial resources on the one hand, with its estimated capital and operating expenses, on the other." Application at 4 (emphasis in original). In the absence of information concerning Palmer's resources and costs, P&T concludes that the MSD determination was in error.

5. In opposition, Palmer states that Section 22.917(a) is not applicable to applications for assignment or transfer of control. Section 22.917(a), Palmer asserts, specifically exempts these applications from its requirements.[4] Palmer further asserts that the Ft. Myers assignment application fully complies with the requirements of Section 22.917(d). Palmer states that it is an experienced communications provider whose financial qualifications are a matter of record before the Commission. In addition, Palmer contends that its loan commitment letter contains the information necessary to establish the availability of the funds to complete the assignment.

6. In its opposition, Kile states that P&T's interpretation of the requirements of Section 22.917(d) of the Rules is contrary to the plain language of the rule and prior case law. Kile asserts that it is absurd to suggest that a proposed assignee must include estimated costs of construction in an application for a system already constructed. The appropriate cost figure in the case of a constructed system, Kile contends, is the purchase price of the facility. In *WKBD, Inc.*, 2 FCC Rcd. 2488 (Mob. Serv. Div. 1988), Kile asserts that the MSD held that estimated operating costs also do not need to be provided when applying to transfer an operating facility. In addition, Kile asserts that the Commission has held that a statement of the applicable interest rate is not required in a bank commitment letter.

7. In reply, P&T argues that the Commission's cellular decisions clearly recognize that indication of the interest rate is an essential term which must be disclosed in a financial commitment letter, and cites *Cellular Communications of Cincinnati*, 53 Rad. Reg. 2d (P&F) 827 (Com. Car. Bur. 1983).

### B. Discussion

8. Section 22.917(d) provides, in pertinent part, that an application for an assignment of license (or permit) or transfer of control of a cellular license (or permit) " . . . shall demonstrate the financial ability of the proposed assignee or transferee to acquire and operate the facility by submitting adequate financial information under the guidelines specified in this section, *as appropriate* (emphasis added)." The Commission has previously stated that the requirement that the applicant demonstrate the financial ability to operate the station for one year refers to unbuilt facilities, and not to operational facilities.[5] When an operational facility is sought to be transferred, a transferee need only demonstrate its ability to finance the acquisition of the facility. Moreover, an applicant, not relying on internal financing, may demonstrate its financial ability by filing a financial commitment letter, and is not required to file a balance sheet.[6] Finally, additional information such as an income statement, statement of projected revenues and expenses, statement of projected sources and application of funds is required only when the financial showing submitted is insufficient.[7]

9. The standard of financial ability applicable to an assignment or transfer of license is one of reasonable assurance that the funds will be available. *CNCA Acquisition Corporation, supra*. Palmer has obtained a financial commitment letter from the Bank of New York which demonstrates a reasonable assurance that a loan of $10 million is available to Palmer for acquiring the facility. The letter provides, in pertinent part that, "This is to confirm that the Bank of New York ("Bank") is willing to lend Palmer Communications Incorporated ("Palmer"), a total of $10 million subject to our mutual agreement on normal terms and conditions." The letter further states that the term of years for the loan would not exceed ten years, and that amortization would began two years after the loan was established. The bank letter sets forth the sufficient terms of the loan to demonstrate that the lender will make financing available, and thus, is in compliance with the reasonable assurance standard.[8] *See generally American Lo - Power TV Network, Inc.*, 103 FCC 2d 4, 10 (1986). In addition, Palmer's loan commitment will provide Palmer with funds for working capital well in excess of the $5,100,000 purchase price of the facility.[9] Finally, as previously stated, the requirement that an applicant demonstrate its ability to operate the proposed station one year after the transfer refers only to unbuilt facilities and not to operational facilities. The Fort Myers facility is operational and therefore, it is unnecessary for Palmer to demonstrate the financial ability to operate the system. Accordingly we find that the MSD properly applied the financial requirements of Section 22.917 of our rules, and that Palmer is financially qualified to be the assignee of Station KNKA598.

### III. SETTLEMENT AGREEMENT PROVISION

#### A. Contentions of the Parties

10. P&T also argues that the MSD erred in not declaring Section 6.7 of the Ft. Meyers settlement agreement void as against public policy. Section 6.7 prohibits its signatories from filing petitions to deny against the applications of the members of the settlement group.[10] However, P&T argues, to the extent that this provision is construed to prohibit the signatories from filing petitions to deny against other, subsequently-filed, non-mutually exclusive applications, this provision should be declared void as against public policy.

#### B. Discussion

11. We find it unnecessary to resolve the question of whether Section 6.7 of the settlement agreement should be declared void as against public policy. Generally, the Commission will not enforce or interpret settlement agreements among cellular applicants. *Guidelines for Settlement and Changes in Ownership of Cellular Systems*, 59 Rad. Reg. 2d (P&F) 1450 (Com. Car. Bur. 1986). The validity of a settlement agreement is, as the MSD correctly stated, a private contractual matter best resolved by negotiation of the parties or by the courts. In addition, we note that P&T did in fact file a petition to deny against the assignment application and that the MSD considered the petition on its merits and denied it.[11] Moreover, we have reviewed the allegations raised by P&T in its application, and concur with the findings of the MSD. In these circumstances, P&T's arguments on this point warrant no further consideration.

### IV. ORDERING CLAUSE

12. Accordingly, IT IS HEREBY ORDERED, that the Application for Review filed by P&T Communications IS DENIED.

FEDERAL COMMUNICATIONS COMMISSION

Donna R. Searcy
Secretary

### FOOTNOTES

[1] Kile's initial application for a construction permit was granted on January 28, 1987. *Robert J. Kile*, 2 FCC Rcd 583 (Mob. Serv. Div. 1987).

[2] P&T has also filed a Petition to Deny Palmer's application for a major modification of the Fort Myers system, and a Motion to Consolidate that proceeding with this one. We do not find that consolidation of these proceedings to be in the public interest, and therefore, deny P&T's request.

[3] "Net liquid assets" represents the excess of current assets readily converted to cash over current liabilities.

[4] In support of its assertion Palmer quotes the language of Section 22.917(a)(3) which provides, "Except as provided in paragraph (d) of this section, each application shall demonstrate an applicant's financial ability as set forth in paragraph (a)(1) of this section, the information required by paragraph (a)(3)(iii) of this section, and whatever other information the Commission may require . . . ." Section 22.917(d) applies to assignment of licenses (or permits) and transfers of control of a corporation holding a license (or permit). *See* n. 5, *infra*.

[5] *See CNCA Acquisition Corporation*, 3 FCC Rcd 6088, 6094 at n. 8 (1988). Such transfers generally do not raise questions with regard to speculative and insincere applicants as does the transfer of a bare construction permit. For this reason, the proposed transfer of a bare construction permit requires the proposed transferee to demonstrate the financial ability to construct and

operate the system for one year. *See McCaw Personal Communications, Inc.*, 60 Rad. Reg. 2d (P&F) 889, 895 (Com. Car. Bur. 1986).

[6] *See* Section 22.917(a)(3) of the Rules. A proposed assignee or transferee intending to rely on internal financing to fund the acquisition of the facility would be required to submit a balance sheet.

[7] Section 22.917(a)(3)(ii) of the Rules.

[8] Contrary to P&T's arguments, *Cellular Communications of Cincinnati, Inc., supra*, does not require that the commitment letter state the interest rate with specificity. "[E]xact details such as interest rates and payment terms are not absolutely required . . . ." *Id.* at 830. *See also Bluegrass Broadcasting Co., Inc.*, 2 FCC Rcd 439 (Com. Car. Bur. 1987) ("It is not necessary that the commitment letter specify the interest rate with specificity . . . ")

[9] Notwithstanding that the transferee of an operating system need not show the ability to operate the system, $10 million appears to be sufficient to cover not only the $5.1 million purchase price, but also reasonably anticipated operating costs. In the original applicant's cost projections it estimated that it would cost $861,270 to operate the system for one year. Because Palmer purchased the system within a month after the original applicant received its construction authorization, it is reasonable to continue to rely on this estimate. Therefore, it appears that Palmer had sufficient funds to both acquire and operate the system for one year.

[10] Section 6.7 provides "Each applicant agrees that it will not directly or indirectly petition to dismiss or deny or otherwise object to the DPCRTS application of any other Party to this Agreement."

[11] The Commission may refuse to accept a settlement agreement if its provisions violate Commission rules or policies. *See Ninety - Two Point Seven Broadcasting, Inc.*, 55 Rad. Reg. 2d (P&F) 607, 610-611 (1984); *Advanced Mobile Phone Service, Inc.*, 53 Rad. Reg. 2d (P&F) 1127,1135 (1983). Generally, we would hold that an agreement to withhold evidence of a serious violation of the Act or the Commission's Rules would be void as against public policy. However, Section 6.7 of the agreement does not have such sinister overtones and appears to be typical of settlement agreements in that it seeks to enforce a settling party's expectation that no further litigation will be brought by the settling parties. Notwithstanding the foregoing, the provision at issue did not in fact prevent P&T from filing a petition to deny, and as such did not interfere with our ability to obtain from interested parties factual information the Commission needed to determine whether grant of the application would be in the public interest. *See* 47 U.S.C. §309(d); *Faulkner Radio, Inc. v. FCC*, 557 F. 2d 866, 875 (D.C. Cir. 1977).