Dariush G. Adli, SBN 204959
  adli@adlilaw.com
ADLI LAW GROUP, P.C.
700 South Flower St., Suite 1220
Los Angeles, California 90017
Telephone: (213) 623-6546
Facsimile: (213) 623-6554

Attorneys for Defendants
Royce International Broadcasting
Corporation, Playa Del Sol Broadcasters,
Silver State Broadcasting, LLC, Golden
State Broadcasting, LLC, and Edward R.
Stolz, II

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

|  |  |
|---|---|
| WB MUSIC CORP., *et al.,* | Case No. 5:16-cv-00600-JGB-(SPx) |
| *Plaintiff,* | **DEFENDANTS' STATUS REPORT RE: CONTEMPT AND RENEWED REQUEST FOR TERMINATION OF THE RECEIVERSHIP** |
| v. | |
| ROYCE INTERNATIONAL BROADCASTING CORP., *et al.,* | |
| *Defendants.* | |

**<u>DEFENDANTS' STATUS REPORT RE: CONTEMPT AND RENEWED</u>**

**<u>REQUEST FOR TERMINATION OF THE RECEIVERSHIP</u>**

## I.   INTRODUCTION

At the March 10, 2021 hearing of Defendants' Motion to Terminate the Receivership, Dismiss the Receiver and Enjoin the Sale of the Radio Stations ("**Termination Motion**") [Dkt. 369], the Court denied the Termination Motion and stated that it intends to continue the Receivership.

For the reasons stated below, there is no legal or equitable basis for continuing the Receivership, much less proceeding with the sale of Defendants' Radio Stations. Moreover, to the extent the Court is inclined to award damages to the Receiver for Defendants' response to its Compliance Orders, such damages must as a matter of law be limited to actual damages the Receiver can establish it has suffered and can't include sale of the stations.

Glaringly, Receiver's Opposition to the Termination Motion [Dkt. 377] ("**Receiver's Opposition**") could not cite to a single case in which a court has allowed a receivership to continue, much less allow a receiver to conclude the sale of assets, under circumstances analogous to those present here – not one case.  Defendants' Reply in support of its Termination Motion [Dkt. 382], addressed each and every point raised by the Receiver's Opposition and emphatically pointed out the lack of any support in law or equity for the Receivership to continue.

## II.   MAINTAINING THE RECEIVERSHIP CONTRADICTS THE COURTS' OWN STATEMENTS

Maintaining the Receivership directly contradicts the Court's own previous position on the very same issue, which Defendants have reasonably relied upon and acted on, to get back their life's work.

/ / /

/ / /

ADLI LAW GROUP, P.C.
(213) 623-6546

2273.201

For example, on October 9, 2020, the Court stated in no uncertain terms:

> If Defendants wish to attempt to prevent the sale of the radio stations by satisfying the Amended Judgment and other post-judgment costs, they are welcome to do so. The Court will not entertain discharging the Receiver and terminating the Receivership absent evidence of satisfaction of the Amended Judgment.   [Dkt. 314.]

Three weeks later, on October 29, 2020, the Court again wrote:

> Given Defendants' interest in preventing the sale of their radio stations, the Court is at a loss to understand why Defendants sought to delay Plaintiffs' Fee Motion.  The sooner the Court adjudicates the Fee Motion, the sooner the receivership can be terminated.... ***The Court will not terminate the receivership unless and until Defendants pay the full Amended Judgment and all other post-judgment costs***.  These costs will not be fully calculated until the Court rules on Plaintiffs' pending Fee Motion.  [Dkt. 327 (emphasis added).]

As the Court previously acknowledged [at Dkt. 344 (emphasis added)]:

> Defendants ***were aggressively attempting to satisfy the Judgment***. On October 21, 2020, Defendants filed an Ex Parte Application for Order to Compel Plaintiffs to Accept Payment of the Amended Judgment. (Dkt. No. 321.)… Before the Court could rule, Plaintiffs filed a Request to Deposit Funds in the Amount of the Amended Judgment. (Dkt. No. 325.)… On October 29, 2020, the Court disposed of both of these requests, ordering Defendants to deposit an amount satisfying the Amended Judgment with the Court. (Dkt. No. 327.) On November 9, 2020, Defendants notified the Court that they had deposited the requisite amount of the Judgement with the Clerk. (Dkt. No. 331; see Dkt No. 333, Financial Entry.)

Acting in good faith reliance on the Court's own pronouncements that it would "terminate the receivership [once] Defendants pay the full Amended Judgment and other post-judgment costs [which were determined after the Court ruled on Plaintiffs' Fee Motion]" Defendants promptly sought leave to deposit with the Court the post-

2273.201

ADLI LAW GROUP, P.C.
(213) 623-6546

judgment fees and costs claimed by the Plaintiffs.  [Dkt. 347.]  Defendants made this request on December 31, 2020, which was actually before the Court adjudicated Plaintiff's Fee Motion and issued the Second Amended Judgment on January 13, 2021. [Dkt. 350.]  On February 3, 2021, the Court recognized receipt of an amount sufficient to satisfy the Second Amended Judgment.  [Dkt. 367.]

At the March 10 hearing, the Court acknowledged Defendants have submitted with the Court an amount sufficient to "pay the full Amended Judgment and all other post-judgment costs."  [Dkt. 327.]  The Court nonetheless indicated that it intends to maintain the Receivership on equitable grounds – in effect, punishing Defendants for taking too long to satisfy the Judgment, and/or for running afoul of the Court's recent Compliance Orders.  The Court, in reflecting on the equities of the case, even noted that it felt discharging the Receivership now would "reward" Defendants' past behavior.

As detailed previously in the Termination Motion and now in the instant filing, the Court does not have the authority to continue the Receivership as a repercussion for Defendants' prior transgressions.  Also, a discharge of the Receiver would be far from a "reward" for Defendants – they are among other things still responsible for significant attorneys' fees incurred over the past six-plus months – but rather is simply the consequence of satisfaction of Amended Judgment.  In contrast, *continuing* the Receivership and *allowing* the sale of the Radio Stations amount to a *punishment* which the Court has no authority to impose.

This is especially the case since there are literally no outstanding debts for Defendants to satisfy, nor have there been any – for over a month.  It is unjust for the Court to justify continuation of the Receivership upon Defendants' past failures or anticipated future failures to obey orders pertaining to the transfer of control of the Radio Stations, when the reason for that transfer of control has already been obviated.

Besides, not only have Defendants done all they can to satisfy the Amended Judgment, but Defendants are also in legal compliance with the Court's Compliance

2273.201

Orders.  Even if the Court were to find Defendants in contempt of those Orders – a conclusion to which Defendants would strenuously object – controlling Ninth Circuit precedent forbids proceeding with the sale of Defendants' Radio Stations as a sanction – again, even for a matter as serious as contempt of Court.  Put another way, even if Defendants are found in contempt, that is not a reason justifying continuation of the Receivership; the only remedy should be compensating the Receiver for any loss.

## III.   DEFENDANTS HAVE FOLLOWED THE COURT'S COMPLIANCE ORDERS AND CANNOT BE HELD IN CONTEMPT

Defendants submit that they easily meet the legal "substantial compliance" standard which is applicable to the Court's Compliance Orders.

The Receiver has submitted three status reports.  [Dkt. 400, 403, and 406.] Defendants filed their response to the Receiver's status reports [Dkt. 404] ("**Response to Receiver's Report**" or "**RRR**"), which, point by point, rebutted the Receiver's allegations of "untruthfulness" by Mr. Stolz by referencing to the time frame of the responses; Mr. Stolz's reliance on board member Ms. McKay for obtaining, assembling, and producing the requested information; and the hearing issues experienced by Mr. Stolz during his in-Court testimonies.  [Dkt. 404.]

In the RRR, Defendants also pointed out that since just February 2, Defendants' counsel has spent over 150 hours in Defendants' intense, concerted, and focused "round the clock" effort to comply with the Court's orders.  Defendants' board member Debby McKay has spent at least that many hours in her "non-stop" efforts to locate, obtain, assemble, organize and produce responsive documents and information.

By any legal or equitable measure – at least since February 2, 2021 – Defendants have complied with the Court's Compliance Orders, to the extent the orders are legally sufficient in clarity, definiteness, and specificity.  The Receiver is

ADLI LAW GROUP, P.C.
(213) 623-6546

2273.201

fast to the trigger in alleging perjury or contempt.  However, "[t]he party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by clear and convincing evidence, not merely a preponderance of the evidence."  *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014); *see also, Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982).  In this case, mere references to in-Court testimony, prior productions, or alleged information possessed by third parties are insufficient to meet even a preponderance of the evidence test, much less the legally required clear and convincing standard.

Certain of the items of request are too vague to meet the legal standard for clarity and definiteness.  For example, atop the list of the original five items proposed by the Receiver, and adopted verbatim by the Court, is a demand for Defendants to:

> Deliver to the Receiver all banking records, account numbers, ***and other financial documents*** relating to the operation of his radio stations (the "stations"). [Dkt. 363].

The vague and indefinite "other financial documents" has created a gigantic loophole through which has allowed the Receiver to gleefully drive its proverbial truck through.  The Receiver's subsequent requests eventually ballooned to twelve additional Court-ordered items – again, all adopted by the Court over Defendants' objections.

As a matter of law, because such requests do "not clearly describe prohibited or required conduct, [they are] not enforceable by contempt." *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir.1996).  The Court should be wary of Receiver's nonchalance in alleging cries of "contempt" and "perjury." As the Supreme Court has cautioned:

> The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a

ADLI LAW GROUP, P.C.
(213) 623-6546

2273.201

deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

*Int'l Longshoremen's Ass'n. v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.").

In this case, the two specific instances of "untruthfulness" or "omission" cited by the Receiver – one, payments made on behalf of the three stations by Artbeatz, and two, the identity of the stations' employees – are explained by clarifying the timeline of the questions, Mr. Stolz's reliance on board member Debby McKay for gathering and producing the related items, and the sound issues experienced by Mr. Stolz during his in-Court testimonies.  [See the RRR at Dkt. 405.][1]

Defendants, in good faith, have strived to comply with the Receiver's requests and Court orders, to the best of their ability and understanding.  In that effort, since February 2, Defendants have produced some 1000 pages of responsive documents, averaging over 80 documents for each of the twelve Court-ordered items.  As such, "because [Defendants have] substantially complied with a reasonable interpretation of the [Court] order, [they] **could not properly be held in contempt**." *In re Dual-Deck*

---

[1] The Receiver's most recent filing, a Second Supplement to its Status Report [Dkt. 406], repeats its claims about a purported payola scheme involving Steve Zapp and his company Artbeatz.  Although the Receiver argues recent disclosures from Mr. Stolz prove he perjured himself, the RRR already clarified that Mr. Stolz testified, to the best of his knowledge at the time, that there were two payments from Zap dating back to July 2020.  In contrast, when the timeframe is expanded to the entirety of 2020, Defendants identified additional payments to the extent he could recall at the time. Later, Ms. Debby McKay contacted Zap and requested that he provide Defendants with the record of such payments for all of 2020, which Defendants received and provided to the Receiver.

DEFENDANTS' STATUS REPORT AND RENEWED REQUEST FOR TERMINATION OF THE RECEIVERSHIP

ADLI LAW GROUP, P.C.
(213) 623-6546

2273.201

*Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695-96 (9th Cir. 1993) (emphasis added) ("Substantial compliance with [a] court order is a defense to civil contempt, and is not vitiated by 'a few technical violations….'"); *see also General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1378–79 (9th Cir.1986) (same).

## IV.   IN THE NINTH CIRCUIT, ANY SANCTION AWARDED FOR CONTEMPT MUST BE LIMITED TO THE RECEIVER'S ACTUAL LOSS

In their latest string of status reports filed with the Court, the Receiver is taking it upon itself to suggest sanctions for Mr. Stolz, including "jail" and "terminating sanctions" for alleged "untruthfulness." The Receiver should take note, however, that its prescribed sanctions are not permitted under controlling Ninth Circuit precedent, according to which contempt sanctions are ***compensatory, not punitive*** and, in any event, must be limited to "that party's ***actual loss***" as a result of the conduct:

> As we have stated previously, a sanction for civil contempt is characterized by the court's desire to ... compensate the contemnor's adversary for the injuries which result from the noncompliance. ***However, an award to an opposing party is limited by that party's actual loss***.

*In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1366–67 (9th Cir. 1987) (emphasis added; internal citations, quotation marks, and brackets omitted) ("*Crystal Palace*").

In general, in the Ninth Circuit, "sanctions for civil contempt take two forms: compensatory and coercive." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983). Decisions in this District Court recognize that civil contempt, "is characterized by the court's desire to compel obedience to a court order… or to compensate the contemnor's adversary for the injuries which result from

ADLI LAW GROUP, P.C.
(213) 623-6546

7

2273.201

the noncompliance." *Mosier v. Lee*, 2017 WL 6211029, at *2 (C.D. Cal. July 25, 2017), *on reconsideration in part*, 2017 WL 6184075 (C.D. Cal. Oct. 3, 2017) ("*Mosier*") (a true and correct copy of which is attached hereto as **Attachment 1**).  A court's power to impose civil contempt is therefore limited by "the ability of the contemnor to comply with the court's coercive order, ***or the actual loss suffered by the contemnor's adversary***.'" *Crystal Palace, supra,* 817 F.2d at 1366.

In *Mosier*, a decision from this District Court, the court refused certain requested sanctions from the court-appointed receiver, including a "contractor bid to replace fixtures" and "Estimate to replace shutters" for intentional damage to a property under receivership; the court determined these were "improper bases on which to impose sanctions." The decision explained that:

> Sanctions for civil contempt are meant to compel obedience or compensate actual loss.  A contractor's bid does not reflect the actual cost incurred by the Receiver to replace the missing fixtures or otherwise repair the Pomello Property. Moreover, these bids do not reflect the costs of replacing only those fixtures and those damages for which the Court has held Khalfani in contempt.

2017 WL 6211029, at *9.

Here, the Court has already implemented coercive measures, including issuance of a Warrant for Mr. Stolz's arrest; requesting the Deputy Marshall at the Court to contact Defendants' counsel Dariush Adli to voluntarily turn himself in and then keeping him incarcerated for 24 hours; issuing a monetary sanction of $10,000 a day for each day Mr. Stolz failed to turn himself in; and making repeated threats to incarcerate Mr. Stolz at each Court hearing held since February 2, as well as through Minute Orders, filings which the whole world can see.

To the extent the Court is now inclined to imposed additional coercive measures and/or award any non-coercive sanctions, such an award must be limited to the actual *damage* suffered by the *Receiver* as a result of such "contempt." *Crystal*

ADLI LAW GROUP, P.C.
(213) 623-6546

2273.201

8

*Palace, supra,* 817 F.2d at 1366 ("as we have stated previously, a sanction for civil contempt is characterized by the court's desire to ... compensate the contemnor's adversary for the injuries which result from the noncompliance. ***However, an award to an opposing party is limited by that party's actual loss***.") (emphasis added).

It is hard to imagine what the Receiver's "actual loss" from any alleged "contempt" on the part of the Defendants would be. In fact, there is none. To the extent that the Receiver contends to the contrary, he bears the burden of supporting its position with proof. Because the Receiver has not shown any such damages so far, an award at this premature point would be improper.

## V.   IF THE COURT INTENDS TO ORDER THE RECEIVERSHIP TO CONTINUE, DEFENDANTS RESPECTFULLY SEEK GUIDANCE FROM THE COURT AS TO WHAT FURTHER ACTION IS REQUIRED ON THEIR PART TO DISCHARGE THE RECEIVER

With respect to satisfaction of the "full Amended Judgment and all other post-judgment costs" [Dkt. 327] – which was the original purpose of the Receivership – Defendants seek guidance from the Court as to what further performance is necessary before the Receiver is discharged.

First, Defendants clarify that they are amenable to the Court transferring Defendants' deposits with the Court to Plaintiffs. As they have reiterated in countless prior filings, Defendants submit that, once this transfer is finally formally completed, the Judgment will be fully satisfied, the purpose of the Receiver will be rendered moot, and the equities will compel discharge of the Receiver, even if there will be other post-termination matters to attend to.

Second, if the transfer of the deposits is insufficient to discharge the Receivership, as the Court implied at the March 10, 2021 hearing, then Defendants seek guidance from the Court with respect to any other potential or actual creditors

ADLI LAW GROUP, P.C.
(213) 623-6546

9

2273.201

which the Court deems as relevant to the continuation/discharge of the Receivership. Defendants submit that – besides Plaintiffs – the only potential creditor that is within this Court's jurisdiction is the Receiver.   While Defendants do not believe the Receiver's prospective claims to its own fees are a legitimate basis for continuing the Receivership, to the extent the Court disagrees with Defendants' position, Defendants respectfully request the Receiver's claims to be addressed and adjudicated promptly.

Third, the Receiver argued during the March 10, 2021 hearing that, if the Receiver were discharged (and, presumably, the sale of Defendants' Radio Stations were enjoined), there would necessarily be resulting harm to, among other parties, the Receiver in the form of: its lost monthly fee; its lost attorneys' fees; and its lost commission for failure to consummate the sale of Defendants' Radio Stations.

Defendants acknowledge that, at the March 10, 2021 the Court denied Defendants' Termination Motion, thus keeping the Receivership in place for the time being.  To the extent that the Court's decision is based on fees and costs owed to the Receiver, Defendants point out the following:

- No bond has been posted: Defendants point out that, on information and belief, the Receiver did not post the $10,000 bond, required by the Court's order of June 6, 2020 [See Item H of Dkt. 284];

- Receiver's monthly fee: Defendants request a briefing on fees due to the Receiver, based on the Court-authorized monthly fees of $7500 [See Item I of Dkt. 284] – Defendants contend that, since its appointment on July 6, 2020, the Receiver has taken no meaningful steps outside of this litigation to exert control and to manage the stations, and in fact the Receiver continues to fail to remit monthly operational costs of the Radio Stations, despite Court Orders to the

/ / /

/ / /

/ / /

ADLI LAW GROUP, P.C.
(213) 623-6546

2273.201

contrary[2];

- <u>Receiver's attorneys' fees</u>: Defendants submit that the Receiver needed to obtain prior Court authorization to engage counsel, or at least Court authorization to be paid for its counsel's fees.  It has not done *either*.  To the extent the Receiver disagrees, Defendants request a briefing on this anticipated expense item; and

- <u>Receiver's commission</u>: Defendants submit the Receiver is clearly not entitled to any commission, because that commission is only earned upon sale of Defendants' Radio Stations, a sale which has not yet been consummated, and has been or will be obviated by Defendants' satisfaction of the Judgment.  [See Item J of Dkt. 284.]

Again, Defendants contend that satisfaction of the Receiver's claims for payment incurred during the Receivership are unrelated to the satisfaction of the Judgment, and the Court should not condition dismissal of the Receivership on adjudication of such costs and fees.

Nonetheless, in an effort to have this Court finally discharge the Receiver, if the Court is inclined to continue the Receivership until the Receiver is paid, then Defendants seek guidance from the Court on what further action they can possibly take to satisfy the Receiver's prospective claims, since as of this filing the Receiver has made no formal or informal demands for payment of the amounts claimed by the Receiver in the March 10, 2021 hearing.  Defendants respectfully request a briefing schedule be expeditiously set to adjudicate amounts owed, if any.

---

[2] For example, the Court's March 2 Order required Defendants to forbear from remitting operating costs, and instructed the Receiver to pay those costs.  Defendants have directed the Receiver to do so on three instances over the past week, without success.  This has caused an immediate crisis attributable to the Receiver's "hands off" approach to operation of the Radio Stations.

DEFENDANTS' STATUS REPORT AND RENEWED REQUEST FOR TERMINATION OF THE RECEIVERSHIP

## VI.   CONCLUSION

As set forth above, and in Defendants' previous submissions to the Court, continuing the Receivership is not supported by any cognizable authority in law or equity.   As such, the Court must promptly transfer the Judgment to Plaintiffs, terminate the Receivership, and restore the entirety of the three radio stations to their legal owner.   If the Court intends to continue the Receivership, justice demands Defendants be given clarified guidance as to what else must occur before the Receivership is terminated.


ADLI LAW GROUP, P.C.


Dated: March 11, 2021                    */s/ Dariush G. Adli*
                                          Dariush G. Adli
                                          Attorneys for Defendants

ADLI LAW GROUP, P.C.
(213) 623-6546

2273.201

# Attachment  1

Mosier v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 6211029

KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part  Mosier v. Lee,  C.D.Cal.,  October 3, 2017

2017 WL 6211029
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Robert P. MOSIER

v.

Christopher M. LEE, et al.

Case No. 8:15–cv–2110–JLS–JCx
|
Filed 07/25/2017

**Attorneys and Law Firms**

Christopher D. Sullivan, Diamond McCarthy LLP, San Francisco, CA, Kathy Bazoian Phelps, Diamond McCarthy LLP, Los Angeles, CA, for Robert P. Mosier.

James Dean Mortensen, James D. Mortensen Law Offices, Providence, UT, Justin H Sanders, Sanders Roberts and Jewett LLP, Los Angeles, CA, for Christopher M. Lee, et al.

**PROCEEDINGS: (IN CHAMBERS) ORDER HOLDING DEFENDANT CHRISTOPHER M. LEE A/K/A RASHID K. KHALFANI IN CIVIL CONTEMPT (Doc. 85)**

JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

**\*1** On April 13, 2017, the Court granted the Receiver Robert P. Mosier's *Ex Parte* Application for an order to show cause why Defendant Christopher M. Lee, a/k/a Rashid K. Khalfani, should not be held in civil contempt for violating the Judgment and order of this Court compelling turnover of the property located at 228 Pomello Dr., Claremont, CA 91711 (the "Pomello Property"). (Hearing Order, Doc. 88.) The Court ordered Khalfani to show cause in writing why he should not be held in civil contempt and permitted the Receiver to file a reply. (*Id.* at 2.) Khalfani filed a response, the Receiver filed a reply, and the Court held a hearing on the matter. (Response, Doc. 89; Reply, Doc. 91; Minutes, Doc. 96.) Having taken the matter under submission and

considered the parties' briefs and oral argument, the Court HOLDS Khalfani in civil contempt.

**I. BACKGROUND**

On June 18, 2015, the SEC filed a complaint against Khalfani and Capital Cove Bancorp LLC seeking to halt "ongoing offering fraud" by Khalfani and Capital Cove. (SEC Compl. ¶ 4, No. 8:15–cv–00980–JLS–JC, Doc. 1.) The Court issued a temporary restraining order that same day, enjoining Khalfani from, among other things, directly or indirectly transferring, selling, or otherwise disposing of any real or personal property owned, controlled, or managed by him or any of his subsidiaries or affiliates. (TRO § VI, No. 8:15–cv–00980–JLS–JC, Doc. 5.) On September 1, 2015, the Court issued a preliminary injunction continuing to enjoin Khalfani from transferring or otherwise disposing of any real or personal property owned, controlled, or managed by him or any of his subsidiaries or affiliates. (Prelim. Inj. § VI, No. 8:15–cv–00980–JLS–JC, Doc. 97.) The preliminary injunction expressly included the Pomello Property. (*Id.*)

On December 17, 2015, the Receiver initiated the instant action against Khalfani and other Defendants [1] seeking to avoid certain transfers made as part of the fraudulent scheme that precipitated the SEC's action. (*See* MSJ Order at 1–2, Doc. 65.) On December 22, 2016, the Court granted in part and denied in part the Receiver's motion for summary judgment in the action. (*Id.* at 15.) After the Receiver abandoned the claims on which the Court did not grant summary judgment, (Dismissal Order, Doc. 70), the Court entered judgment in the action and ordered, among other things, that Khalfani and Defendant Noojaew Cawte turn over the Pomello Property within 14 days of the entry of judgment. (Judgment at 2, Doc. 71.)

Khalfani and Cawte failed to turn over the Pomello Property as ordered. (Turnover Order at 2, Doc. 81.) On March 16, 2017, upon the Receiver's motion, the Court issued an order compelling turnover of possession of the Pomello Property and granting the Receiver's request to obtain a writ of assistance from the Clerk of the Court. (Turnover Order at 3.)

On April 5, 2017, the Receiver went with four agents from the U.S. Marshals office to the Pomello Property to obtain possession. (Mosier Decl. ¶ 6, Doc. 85.) The Marshals forcibly entered the Property and delivered possession to the

2017 WL 6211029

Receiver around 8:20 a.m. (*Id.*) At that time, the Property was secure and the Receiver did not see any evidence of prior forcible entry into the house. (*Id.*)

**\*2** Upon entry, the Receiver noted that significant fixtures had been removed from the house and substantial damage inflicted on the floors, ceilings, walls, tiles, and appliances. (*Id.* ¶ 7.)

In light of the condition of the Pomello Property, the Receiver filed an *Ex Parte* Application for issuance of an order to show cause as to why Khalfani should not be held in civil contempt. (Ex Parte App., Doc. 85.)

## II. LEGAL STANDARD

"Absent a stay, all orders and judgments of courts must be complied with promptly." *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983) (internal quotation marks and citation omitted). "[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966). "Civil contempt ... consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). "The contempt 'need not be willful,' and there is no good faith exception to the requirement of obedience to a court order." *Id.* (citation omitted). "The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (quoting *Stone v. City and Cty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992)). Thus, to hold a party in civil contempt, the Court must determine "(1) that [the non-party] violated [a] court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *In re Dual–Deck*, 10 F.3d at 695.

Sanctions for civil contempt take two forms: compensatory and coercive. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983). Because civil contempt "is characterized by the court's desire to compel obedience to a court order ... or to compensate the contemnor's adversary for the injuries which result from the noncompliance," a court's power to impose civil contempt is limited by "the ability of the contemnor to comply with the court's coercive order, *id.*, or the actual loss suffered by the contemnor's adversary, *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1366 (9th Cir. 1987).

## III. DISCUSSION

### A. Failure to Timely Turnover the Pomello Property

The Court's Judgment on January 11, 2017, ordered "Defendant Tealuck Family Trust, by and through co-trustees and Defendants Rashid Khalfani and Noojawe Cawte ... to turn over the Pomello Property to the Receiver within 14 days of the date of entry of this Judgment." (Judgment at 2.) It is undisputed that Khalfani failed to comply with the Court's Judgment to turn over the Pomello Property within the time provided in the Judgment, and the Receiver had to incur expenses to evict Khalfani from the Property and obtain possession of it. (Reply at 4–6.) Holding Khalfani in contempt for failure to timely turn over the Pomello Property and requiring him to reimburse the Receiver for those expenses and the expenses of litigating this civil contempt motion is therefore appropriate.

**\*3** However, there is evidence that Khalfani in fact "left the side gate and all three (3) exit doors in the rear of the property UNLOCKED and open." (Khalfani Decl. ¶ 2, Doc. 89–1.) The locksmith invoice submitted by the Receiver to the Court contains a notation stating the "[b]ack door was unlocked, no need to gain entry." (Mosier Reply Decl., Ex. 9 at 9, Doc. 91.) To the extent the Receiver used a locksmith to force open the front door, that expense appears to have been unnecessary and shall not be included in any contempt sanctions.

### B. Removal of Fixtures and Damage to the Property

The Receiver also seeks sanctions for Khalfani's alleged removal of several fixtures from the Pomello Property and for damage caused to the premises. (Mosier Decl. ¶ 8.) Before addressing the allegedly removed items in detail, the Court first addresses the parties' arguments regarding the general character of the Property, the admissibility of certain

2017 WL 6211029

evidence, and the status of the allegedly removed items as fixtures.

Khalfani consistently asserts in his Opposition brief and in his declaration that the Pomello Property was acquired as, and always remained, a "rehab" property. (Response at 6, 15–16, 19; Khalfani Decl. ¶¶ 5, 7–8, 14.) These assertions are belied by the online listing of the Pomello Property in July 2012 when Khalfani, through Capital Cove, first acquired the Property. The listing states that the condition of the Property and the Structure is "Updated/Remodeled" and "Turnkey." (Walters Decl., Ex. 10 at 3, Doc. 91.) The description in the listing highlights the "[m]any recent upgrades" in the home, including a "newer 6 burner gas stove" and "newer windows, wood flooring, and extensive wood shutters." (*Id.* at 2.) The photographs depicting the Property do not show a full rehab and heavy renovation project. (*See id.* at 4–5.) Three years later, when the Pomello Property was again listed for sale in July 2015, the condition of the Property and the Structure was categorized again as "Turnkey." (Walters Decl., Ex. 11 at 2, Doc. 91.) The photographs attached to the listing again do not show a rehab property in need of substantial renovation. (*See id.* at 4–6.) Based on the evidence before the Court, the Court finds that the Pomello Property was not a "rehab" property in need of substantial renovation and repairs.

Khalfani's argument that the listings and photographs cannot serve as evidence for lack of authentication is unavailing. The listings are taken from a website accessible only to dues-paying realtors. (Walters Decl. ¶ 3, Doc. 91.) It is reasonable to infer that information and photographs posted for the purpose of selling a property accurately describe the condition of the property at the time of posting, even accounting for some degree of salesmanship. Moreover, Khalfani admits that the Tealuck Family Trust, of which he was co-trustee, listed the Pomello Property for sale in July 2015. (Khalfani Decl. ¶ 14.) Therefore, his argument that "[t]here is no way to know when the photos were taken, by whom, or who composed the listing," (Evid. Obj. at 11, Doc. 92), fails to materially contest the authenticity of the July 2015 listing and accompanying photographs.

Khalfani also argues that the items he removed are not fixtures under California law. (Response at 11–18.) Although the parties argue over the status of particular items as fixtures or personal property, the Court finds the distinction irrelevant

for purposes of determining whether Khalfani should be held in contempt. The Court issued a TRO and preliminary injunction in the SEC's action against Khalfani to maintain the status quo pending resolution of the SEC's claims that Khalfani committed fraud against his investors. (*See* TRO at 1–3; Prelim. Inj. at 1–3.) That fraud allegedly consisted of Khalfani (and Capital Cove Bancorp LLC) raising "at least $1.9 million from over fifteen U.S. investors over a two-year period by falsely claiming to invest proceeds in distressed real estate." (SEC Compl. ¶ 4.) The TRO and preliminary injunction sought to preserve the status quo by, among other things, prohibiting Khalfani and his subsidiaries or affiliates from transferring or otherwise disposing of "real or personal property" they owned, managed, or controlled. (*See* TRO § VI; Prelim. Inj. § VI.) Given the context, the "personal property" referred to in the TRO and preliminary injunction reasonably encompasses those items related to, or included with, any real estate managed by Khalfani or his subsidiaries or affiliates. These items include, for example, electrical appliances that might otherwise be considered personal property rather than fixtures. Such broad language was necessary in light of the allegations made by the SEC against Khalfani and the likelihood that Khalfani's purchase of real property with investor funds included purchase of electrical appliances and other items that, while not traditionally fixtures, are often included in the purchase of real property and are associated with it.

*4  Moreover, Khalfani cannot claim as his personal property any electrical appliances or other non-fixture items that were purchased with investor funds, ostensibly on their behalf. Here, it is undisputed that that the Pomello Property was first purchased by Capital Cove Bancorp LLC before it was transferred to the Tealuck Family Trust, and the Court granted summary judgment on the Receiver's claim seeking avoidance of the transfer. (MSJ Order at 2, 11–12; *see also* SGD ¶ 33, Doc. 46.) Whatever Khalfani might have intended with any non-fixture items he replaced on the Property, he was not at liberty to simply take them for himself when he used investors' funds to obtain the Property and its contents in the first place.

Therefore, in considering the Receiver's allegations as to specific items removed from the Property, the Court considers whether the Receiver's evidence clearly and convincingly shows that the items were included with the Property at the time Khalfani purchased the Property and whether those

items (or their equivalents) were present on the Property when the Court issued its TRO. If so, Khalfani's removal of those items constitutes a violation of the Court's TRO and preliminary injunction and is a basis for holding him in contempt. A reasonable interpretation of the Court's Judgment and subsequent turnover order includes the presumption that Khalfani was to turn over the Pomello Property in the condition it was in at the time the Court issued its TRO and preliminary injunction.

### 1. Entry and Dining Room

The Receiver alleges that light fixtures are missing from the entry to the Pomello Property and the dining room. (Mosier Decl. ¶¶ 8(a)–(b).) With respect to the entry, the Court finds the evidence insufficient to support a finding that a light fixture was removed in violation of the Court's Judgment. The Receiver declares only that a light fixture is missing from the entry. (*Id.*) Although the Receiver submits a photograph purportedly showing "Missing light fixtures," (*see* Walters Decl., Ex. 12 at 2, Doc. 91), the photograph alone does not clearly establish that the light fixture was removed while Khalfani had control over the Property or that the photograph even depicts the "entry" to the Property.

However, the Court finds the evidence sufficiently shows that a light fixture was removed from the dining room. The Receiver submits photographs from listings of the Pomello Property in July 2012 and July 2015 which clearly show a chandelier in the dining room, (Walters Decl. ¶¶ 4–5; Walters Decl., Exs. 10, 11), and a photograph taken on April 5, 2017, showing that the chandelier is now missing, (Walters Decl. ¶ 6; Walters Decl. Ex. 12.) The contract of sale Khalfani signed when he acquired the Pomello Property included existing lighting fixtures in the sale. (Mosier Decl., Ex. 4 at 5, Doc. 85.) Based on the evidence, the chandelier apparently was transferred along with the Property when Khalfani acquired it. Given that the July 2015 listing shows the chandelier still attached to the ceiling, it must have been removed sometime thereafter, in which case Khalfani violated the Court's TRO and preliminary injunction prohibiting him from wasting, dissipating, or otherwise disposing of any real or personal property he controlled, managed, or had in his possession. (TRO § VI; Prelim. Inj. § VI.)

Therefore, the Court holds Khalfani in contempt for the removal of the dining room light fixture.

### 2. Guest Bath and Master Bath

The Receiver further alleges that the guest bathroom is missing a toilet, sink, light fixture, and window coverings. (Mosier Decl. ¶ 8(c).) In addition, the shower doors have been removed but remain onsite. (*Id.*) The Receiver also states that "all other fixtures" are missing, that "tile is broken out," and that the "water pipes [are] cut off." (*Id.*) Similarly, the Receiver alleges that the master bathroom is missing a bath tub, toilet, sinks, vanity drawers, and window coverings. (*Id.* ¶ 8(e).) Like the guest bath, the shower doors have been removed but remain onsite. (*Id.*) The Receiver also claims that "all other hardware and fixtures" are missing, that there is tile damage to the shower, and that removal of the bath tub left holes in the floor and sub-floor. (*Id.*) The Receiver's evidence supports some of his claims but not others.

**\*5** The bathroom photographs taken on April 5, 2017 are not taken from the same perspective as the bathroom photographs from the July 2015 listing of the Pomello Property. (*Compare* Walters Decl., Ex. 12 at 3–4 *with* Walter Decl., Ex. 11 at 4–5.) Accordingly, a perfect before/after comparison is not possible. Nonetheless, by comparing the photographs it is clear certain items that appear in the earlier photos have been removed. The "Downstairs Bath Vanity" photo in Exhibit 12 clearly shows that drawers, window coverings, and a sink are missing when compared to a photo of the same vanity on page 4 of Exhibit 11. Comparing the "Downstairs Bath Shower" photo in Exhibit 12 with photos depicting the same shower in Exhibit 11 shows that a rectangular hole has been made in the wall and the shower doors, shower faucets, and shower head have been removed.

With respect to the master bathroom, the photos clearly show that the shower and bath tub fixtures, shower doors, bath tub, sinks, and window coverings were removed sometime after July 2015 and before the Receiver gained possession of the Property. (*Compare* Walters Decl., Ex. 12 at 4 *with* Walter Decl., Ex. 11 at 5.) Khalfani's photographs further support this conclusion. These photos show that the shower and bath tub fixtures, shower doors, bath tub, window coverings, and sinks were removed. (Khalfani Decl., Photos Nos. 18–19, 21,

Adil, Arya 3/11/2021
For Educational Use Only

Mosier v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 6211029

Doc. 89–1.) In fact, Khalfani all but confirms that the tub and sinks were removed while the Property was under his control when he admits that the tub and sinks "were removed by professionals." (Khalfani Decl., Photos Nos. 18, 21.) In addition, Khalfani's explanation that the "shower head piping was professionally capped" indicates that the hole left in the master bath shower was done at his direction. (Khalfani Decl., Photo No. 19.) Finally, comparing Photo 21 of Khalfani's declaration with the Receiver's photos of the Property on April 5, 2017 shows that two vanity drawers have also been removed from the Property. (*Compare* Khalfani Decl., Photo No. 21 *with* Walters Decl., Ex. 12 at 4.)

The Court also finds the evidence sufficiently shows that Khalfani improperly removed toilets from the guest and master bathrooms. The Receiver's photographs from April 5, 2017, clearly show that toilets are missing from both bathrooms. (*See* Walters Decl., Ex. 12 at 3–4.) Although there are no "before" photographs depicting that toilets were present in the empty spaces, the July 2015 listing of the Pomello Property described the Property as a "Turnkey" property and gave no indication that the buyer would have to install toilets after purchasing the Property. (*See* Walters Decl., Ex. 11.) The Court finds this representation sufficient to find that toilets were present on the Property at least as late as July 2015.

The Court's TRO and preliminary injunction prohibited Khalfani from changing, concealing, or encumbering any real or personal property over which he had control or possession. (TRO § 6; Prelim. Inj. § 6.) As noted above, the July 2015 listing shows that the items described above were in place when the TRO was in effect. Khalfani was not at liberty at that point to remove the items as he saw fit.

However, the Court finds the evidence insufficient to find any improper removal of light fixtures from the bathrooms. Aside from the Receiver's declaration, the Court does not find any evidence that a light fixture is missing from the guest or master bathrooms. A declaration constitutes evidence, but the Court finds such evidence alone fails to meet the clear and convincing standard where the Receiver was in a position to take photos of the missing fixtures to support his declaration and failed to do so.

Accordingly, the Court finds the evidence sufficient to hold Khalfani in contempt for (1) removing the sink, shower doors, shower fixtures, toilet, window coverings, and vanity drawers from the guest bathroom; (2) leaving a hole in the guest bathroom wall in removing the shower fixtures; (3) removing shower and bath tub fixtures, shower doors, bath tub, sinks, vanity drawers, toilet, and window coverings from the master bathroom; and (4) leaving holes in the wall and floor of the master bathroom in removing the shower and bath tub fixtures. The evidence is insufficient, however, to hold Khalfani in contempt for removing any light fixtures from the bathrooms.

### 3. Kitchen

**\*6** With respect to the kitchen, the Receiver alleges that the dishwasher and the doors to the double oven are missing, the range top has been partially removed, and there is "[c]abinet damage." (Mosier Decl. ¶ 8(d).) A comparison of the photos from the July 2015 listing and those taken on April 5, 2017, show that the double oven doors and a range top were indeed removed while Khalfani retained control over the Property and the Court's TRO and preliminary injunction were in effect. (*Compare* Walters Decl., Ex. 11 at 4 *with* Walters Decl., Ex. 12 at 3.) As for the dishwasher, although the only photographic evidence is a photo showing an empty space where the dishwasher should have been, (Walters Decl., Ex. 12 at 3), both the July 2012 and July 2015 listings of the Pomello Property indicate that a double oven, gas stove, and a dishwasher are included in the purchase of the Property. (*See* Walters Decl., Ex. 10 at 2; Walters Decl., Ex. 11 at 2.) The Court finds this evidence sufficient to conclude that in addition to the double oven doors and the range top, a dishwasher was also removed after July 2015. In doing so, Khalfani violated the Court's TRO and preliminary injunction.

Accordingly, the Court finds the evidence sufficient to hold Khalfani in contempt for removing the double oven doors, dishwasher, and the top of the gas range from the Pomello Property. However, the Receiver fails to support his vague allegation of "cabinet damage" with sufficient evidence, and the Court declines to hold Khalfani in contempt for that claim.

2017 WL 6211029

#### 4. In General: Carpet, Window Coverings, Interior Doors, Plumbing, and Holes in Ceilings

With respect to the Pomello Property in general, the Receiver alleges that (1) carpet is missing in the living room, hallways, stairs, and all five bedrooms; (2) "[a]ll window coverings are missing"; (3) approximately twenty-two interior doors are missing; (4) there are "uncapped and cut pipes and plumbing issues throughout the house in various locations"; and (5) "[s]everal" holes in the ceilings exist throughout the house. (Mosier Decl. ¶¶ 8(f)–(i), 8(k).)

The Receiver's evidence shows several instances where carpet has been removed from various locations in the Property. (*Compare* Walters Decl., Ex. 11 at 4–5 *with* Walters Decl., Ex. 12 at 2–4 *and* Mosier Decl., Ex. 2 at 4.) Contrary to Khalfani's contention, the photos from the July 2015 listing show that carpet was installed on the Property while it was under his control and while the Court's TRO was in effect. (*See* Walters Decl., Ex. 11 at 4–5.) In fact, Khalfani's own photos show that the carpet has been removed while he possessed the Property. (Khalfani Decl., Photos Nos. 2, 6–7, 9, 11–12, 14–16.) Moreover, the photos clearly show that the carpet has been fitted to the floor plans of the house, (Walters Decl., Ex. 11 at 4–5), and the floor surfaces where the carpet was removed clearly are not finished surfaces that can be used without carpeting. (*See* Khalfani Decl., Photos Nos. 2, 6–7, 9, 11–12, 14–16.)

Accordingly, the Court holds Khalfani in contempt for removing the carpeting from the Property in violation of the Court's TRO and preliminary injunction.

However, the Receiver's claim of missing window coverings is too vague for the Court to make any finding of contempt. The Receiver states that "all" window coverings are missing and that "these appear to be shutters." (Mosier Decl. ¶ 8(g).) It is unclear from the Receiver's declaration how many window coverings there are supposed to be. "All" window coverings could equal the number of windows, or it could be a subset of the total number. Moreover, not all of those coverings need to be custom shutters. As noted above, the window coverings in the guest bathroom were drapes rather than shutters. The photos attached to the July 2015 listing indeed depict shutters on several windows, and the photos taken on April 5, 2017,

show that many windows do not have any coverings. (*See* Walters Decl., Ex. 11 at 4–5; Walters Decl., Ex. 12 at 3–4.) However, it is unclear to the Court that the windows depicted in the April 5, 2017 photos were windows that previously were covered with custom shutters. Despite having the opportunity to carefully document and photograph each window that is missing its coverings, the Receiver fails to submit such evidence, and the Court declines to try to match the windows in the various photos in an attempt to determine whether any shutters have been improperly removed.

**\*7** Accordingly, the Court finds the evidence insufficient to hold Khalfani in contempt for removing "all" window coverings.

Similarly, the Receiver fails to produce sufficient evidence for his claim that approximately twenty-two interior doors are missing from the Property. The number of missing doors comes from the Receiver's declaration and a memorandum drafted by the Receiver following inspection of the Pomello Property on April 5, 2017. (Mosier Decl. ¶ 8(h); Mosier Decl., Ex. 1, Doc. 85.) However, the only clear evidence of missing doors are from the Receiver's photographs, which clearly show that the double doors to the master bedroom and a door to one of the bathrooms have been removed, (Walters Decl., Ex. 12 at 3–4), and Khalfani's photos, which clearly show that doors are missing from two other bathrooms, (Khalfani Decl., Photos Nos. 9, 17, 21.) At most, these are five missing doors. The Receiver fails to submit photos of the other missing doors although he had the opportunity to do so. Without any more evidence, the Court cannot conclude that other doors were improperly removed from the Property.

Accordingly, the Court holds Khalfani in contempt for the removal of only those five doors that the evidence clearly shows are missing.

Finally, the Court finds the evidence insufficient to hold Khalfani in contempt for plumbing issues throughout the house and "[s]everal holes in [the] ceilings." Other than the plumbing issues pertaining to the bathrooms, which have already been discussed above, the Receiver fails to specifically identify any other problems with the plumbing in the house. And despite the reference to several holes, the Receiver submits only two photographs showing what appears to be the same hole in the ceiling. (Mosier Decl., Ex. 2 at 3; Walters Decl., Ex. 12 at 3.) Again, the Receiver

2017 WL 6211029

was in a position to photograph and record any holes or plumbing issues in detail, but failed to do so. As for the photographic evidence that the Receiver does submit, the evidence is unclear as to whether the hole was created after the Court issued its TRO and preliminary injunction.

Therefore, the Court find the evidence insufficient to hold Khalfani in contempt for additional plumbing issues or holes in the ceiling.

### 5. Pool and Spa

The Receiver further alleges that Khalfani physically detached and removed all pool equipment from the Pomello Property, leaving standing water behind that created health and safety issues. (Mosier Decl. ¶ 8(j).) Khalfani argues that the Receiver's evidence is insufficient to prove that any pool equipment was present at any relevant time or that such equipment was thereafter removed. (Response at 16.)

Contrary to Khalfani's assertion, the July 2015 listing of the Pomello Property shows the pool and spa in use. (Walters Decl., Ex. 11 at 6.) This is sufficient evidence to show that pool equipment was installed on the Pomello Property after the Court had issued its TRO. Moreover, when Khalfani purchased the Property in July 2012, the contract of sale included existing pool and spa equipment in the purchase. (*See* Moser Decl., Ex. 4 at 5.) The July 2012 and July 2015 listings made no indication that the purchaser would have to obtain his or her own pool equipment to make use of the in-ground pool and spa. (*See* Walters Decl., Exs. 10–11.) Therefore, the removal of any pool or spa equipment must have occurred after the Court issued its TRO.

**\*8** Moreover, the Court finds Khalfani responsible for the standing water the Receiver found upon gaining possession of the Property. Given that Khalfani held the Property prior to the Receiver gaining possession, the standing water issue could have been avoided by actively cooperating with the transfer and the Court's Judgment rather than simply leaving the premises without notice.

Accordingly, the Court holds Khalfani in contempt for removing the pool and spa equipment from the Pomello

Property and the expenses incurred by the Receiver to fix any standing water issues.

### 6. Landscaping

Finally, the Receiver alleges that, due to the water being shut off, there are "approximately 5 dead trees in the yard," one of which may be in danger of falling. (Mosier Decl. ¶ 8(l).) The Court finds the evidence insufficient to conclude that any landscaping issues are the result of Khalfani's violation of the Court's Judgment. Many of the landscaping photos submitted by the Receiver and Khalfani are not comparable as they depict different parts of the Property from different angles. Where some comparison is possible, such as with the basketball court, (Walters Decl., Ex. 11 at 6; Walters Decl., Ex. 12 at 2; Khalfani Decl., Photo No. 27), it is not clear to the Court that any deterioration in the condition of the trees or other plant life was caused by Khalfani's misconduct.

Accordingly, the Court finds the evidence insufficient to hold Khalfani in contempt with respect to the landscaping.

### C. Amount in Sanctions

In light of Khalfani's disobedience, the Receiver requests that the Court order Khalfani to pay "at least $175,488.25" in contempt sanctions "subject to increase at the time of the hearing to include any additional fees and costs incurred after April 30, 2017." (Reply at 4.) The Receiver's requested sanctions can be broken down as follows:

Attorneys' fees through 4/30/2017—$18,929.20

Costs including U.S. Marshal fees—$2,579.20

Receiver fees 4/1/2017 through 4/30/2017—$13,246.00

Locksmith charges—$366.15

Emergency repairs (plumbing)—$1,103.70

Contractor bid to fix landscape—$9,138.00

Monthly yard maintenance charge—$410.00

Contractor bid to replace fixtures—$75,897.00

Estimate to replace shutters—$20,000

Mosier v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 6211029

Lien interest charges (4 months)—$27,496.00

Insurance (pro rata 4 month for delay)—$2,320.00

Taxes (pro rata 4 months)—$4,003.00

(*Id.*) Although the Receiver summarizes the components of the requested amount, (*see* Mosier Reply Decl. ¶ 4, Doc. 91), he does not provide sufficient evidence to justify each amount. The Court imposes sanctions only for those amounts that are supported by sufficient evidence.

The "Attorneys' fees" for $18,929.20 are well-documented. (Phelps Reply Decl., Ex. 13 at 2–6, Doc. 91.) All but one item relates to Khalfani's failure to comply with the Court's Judgment. The time spent on each task and the hourly rates charged appear reasonable. Phelps' $500 hourly rate is less than the hourly rate given in the fee schedule provided to the Court when the Receiver sought to employ Diamond McCarthy has general counsel in the SEC action. (*See* Fee Schedule, No. 8:15–cv–00980–JLS–JC, Doc. 42.) The only item that does not appear to arise out of Khalfani's failure to comply is an entry on February 27, 2017 for work done regarding Khalfani's notice of appeal for $529.20. (*Id.* at 3.) Subtracting that amount leaves $18,400.00 for attorneys' fees incurred in response to Khalfani's failure to comply with the Judgment.

 **\*9** The "Costs including U.S. Marshal fees" of $2,579.20 is also well-documented. (Phelps Reply Decl., Ex. 13 at 6–7.) Only two cost entries appear amiss—postage and copy expenses recorded on January 25, 2017 that total $368.39. (*Id.* at 6.) Although recorded on January 25, the descriptions for these expenses show that they were incurred over the previous two months. (*Id.*) This was before Khalfani failed to comply with the Court's Judgment and so cannot be related to that matter. Subtracting the $368.39 leaves $2,210.81 for costs incurred to enforce the Court's Judgment.

With respect to the "Receiver fees," the Court finds those fees well-documented, but adjustment is necessary from the Receiver's requested amount. Although the Receiver requests a total of $13,246.00 in sanctions for this category, he fails to explain how he arrived at that amount. His declaration states only that a list of the fees incurred by him and his staff are attached as "Exhibit '9.' " (Mosier Reply Decl. ¶ 5.) Exhibit 9 consists of an invoice from the

Receiver's company, an invoice from the Receiver's CPA, and an invoice from a locksmith. (Mosier Reply Decl., Ex. 9.) Because the Receiver requests locksmith charges separately, (Reply at 4), the locksmith invoice clearly is not part of any "Receiver fees." The task descriptions on the Receiver's company's invoice, the time spent, and the hourly rates, appear reasonable and directly related to addressing the problems caused by Khalfani's failure to comply with the Court's Judgment. (Mosier Reply Decl., Ex. 9 at 2–5.) Therefore, imposing as sanctions the total invoice amount of $10,573.20 for the work performed is appropriate. As for the invoice of the Receiver's accountant, the Court finds many of its time entries to be for matters unrelated to Khalfani and the Pomello Property. (*See* Mosier Reply Decl., Ex. 9 at 6–8.) After subtracting all time entries the Court finds unrelated to the instant matter, the total fees appropriately imposed as sanctions amounts to $2,888.50. Adding the two amounts together totals $13,461.70.

Although the locksmith charges are well-documented, the locksmith's invoice indicates that the back door to the Pomello Property was unlocked. (Mosier Reply Decl., Ex. 9 at 9.) Because forcible entry was unnecessary, these charges were not caused by Khalfani's disobedience and are not a proper component of any sanctions.

The Court declines to award the remaining requested sanctions for lack of sufficient evidence. The Receiver's charges for "Contractor bid to replace fixtures" and "Estimate to replace shutters" are based on bids the Receiver received from contractors. (*See* Order Auth. Repair, No. 8:15–cv–00980–JLS–JC, Doc. 475; Receiver Report, No. 8:15–cv–00980–JLS–JC, Doc. 472–1.) These are improper bases on which to impose sanctions. Sanctions for civil contempt are meant to compel obedience or compensate actual loss. *Falstaff Brewing*, 702 F.3d at 778; *In re Crystal Palace, 817 F.2d at 1366.* A contractor's bid does not reflect the actual cost incurred by the Receiver to replace the missing fixtures or otherwise repair the Pomello Property. Moreover, these bids do not reflect the costs of replacing only those fixtures and those damages for which the Court has held Khalfani in contempt.

Finally, the Receiver has not attached any documentation, aside from his own declaration, showing how he determined the expenses incurred for the remaining items: Emergency repairs (plumbing), Contractor bid to fix landscape, Monthly

Mosier v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 6211029

yard maintenance charge, Lien interest charges (4 months), Insurance (pro rata 4 month for delay), and Taxes (pro rata 4 months). Although the Receiver's late filing of an "updated damage summary" appears to address some of these expenses, there is no declaration explaining the untimely documents and the Court cannot confirm their accuracy or authenticity. Accordingly, the Court cannot confirm that these expenses can properly be imposed on Khalfani as contempt sanctions.

**\*10** In light of the above, the total amount in sanctions that can properly be imposed is $34,072.51. This figure is the sum of only those expenses that have been adequately documented and that actually reflect expenses incurred as a result of Khalfani's disobedience of the Court's Judgment.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court HOLDS Khalfani in civil contempt. Khalfani is ORDERED to pay civil sanctions of $34,072.51 for the Receiver's attorneys' fees and costs incurred to enforce the Court's Judgment.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6211029

## Footnotes

1    The other Defendants are Philip Andrews, Noojaew Cawte, the Tealuck Family Trust, and Nepenthe Capital Management, Inc.

**End of Document**                                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing documents with the Clerk of the Court for the United States District Court for the Central District of California by using the CM/ECF system on March 11, 2021:

**DEFENDANTS' STATUS REPORT RE: CONTEMPT AND RENEWED REQUEST FOR TERMINATION OF THE RECEIVERSHIP**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF System.

I certify under penalty of perjury that the foregoing is true and correct. Executed March 11, 2021 at Los Angeles, California.

Date: March 11, 2021

*/s/ Dariush G. Adli*
Dariush G. Adli

2273.201

ADLI LAW GROUP, P.C.
(213) 623-6546